*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 10, 2023

Plaintiff-Appellee,

v

No. 359969
Kent Circuit Court
LC No. 19-009658-FH

ROBERT DWANE HOWARD,

Defendant-Appellant.

Before: YATES, P.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

Defendant, Robert Dwane Howard, was convicted by jury verdict for crimes involving an assault upon his girlfriend. Defendant appeals of right his convictions for assault by strangulation, MCL 750.84(1)(b); malicious destruction of personal property with a value of at least $200 but less than $1,000, MCL 750.377a(1)(c)(*i*); and domestic violence, third offense, MCL 750.81(5). The trial court sentenced defendant, as a fourth-offense habitual offender, see MCL 769.12(1)(a), to 25 to 40 years in prison for assault by strangulation, 53 days in jail for malicious destruction of private property, and 2 to 5 years in prison for domestic violence, third offense. Defendant argues that the trial court violated his rights by permitting the prosecutor to have the victim's preliminary examination testimony read into the record at trial and by having him removed from the courtroom without notice after an outburst. He also contends that he did not receive effective assistance of counsel and that the prosecutor improperly amended the information to add the domestic-violence charge. Finally, he asserts that the mandatory minimum sentence of 25 years' imprisonment for habitual offenders was cruel or unusual. We affirm.

## I. FACTUAL BACKGROUND

On the night of September 21, 2019, defendant assaulted the victim, who was defendant's girlfriend. At the preliminary examination, the victim testified that she had had an on-again-off-again relationship with defendant and that they had a son together. She stated that they had broken up because they argued and there was some "violent stuff," but they had reunited in May 2019. In her testimony at the preliminary examination, the victim explained that, on September 21, 2019, she had an argument with defendant after defendant saw a message on her phone that led him to

believe that she had been cheating on him. She stated that defendant threw her phone, forced her onto the floor, and covered her nose and mouth with his hand. Consequently, she had difficulty breathing, but she freed herself and fled from the apartment. The victim testified that defendant apparently followed her in his car. He pulled over, got out, approached her, and struck her so hard in the back of the head that she fell to the ground.

Several hours later, the victim went to the hospital. Dr. Matthew Tanis testified at trial that he treated the victim and observed that she had scrapes, petechiae in her eyes and inside her mouth, bruising, and tenderness on her neck. Dr. Tanis stated that petechiae can result from strangulation. He diagnosed the victim with cervical strain and a concussion. The jury also heard testimony from a police officer who responded to the hospital, Officer Marc Donker, and saw the photographs of the victim that Officer Donker took. On the basis of that evidence, a jury found defendant guilty on all three charges. The trial court sentenced defendant to serve 25 to 40 years in prison for the offense of assault by strangulation, a shorter prison term for domestic violence, and a modest jail term for the crime of malicious destruction of property.

On January 11, 2022, defendant filed a claim of appeal. The trial court subsequently held two separate evidentiary hearings on defendant's motions for a new trial. First, the trial court held a hearing on April 25, 2022, where the victim testified at length about a post-trial affidavit that she signed. She explained under oath that she had been "begged—threatened to change the story up to help [defendant's] situation out." In light of that testimony, the trial court denied the motion for a new trial based on newly discovered evidence because, in the trial court's view, the victim made clear under oath that her post-trial affidavit furnished an inaccurate description of what happened on the night of the offenses of conviction. As the trial court put it, "we have a case of a recantation of a recantation." Thereafter, defendant requested and obtained a remand from this Court for the purpose of developing a record on whether defendant was denied effective assistance of counsel. As a result, the trial court conducted a second post-trial evidentiary hearing on October 27, 2022, and then issued a 19-page opinion and order on December 8, 2022, rejecting defendant's claims of ineffective assistance of counsel. We must now resolve defendant's appeal against the backdrop of the comprehensive record commendably developed in the trial court.

## II. LEGAL ANALYSIS

Defendant has presented six issues for consideration on appeal. First, defendant contends that the trial court erred in admitting at trial the victim's preliminary examination testimony when she failed to appear at trial to testify in person. Second, defendant claims he received ineffective assistance of counsel at the plea-bargaining stage of the case. Third, defendant insists that the trial court erred by permitting the prosecutor to add the domestic-violence charge when the trial was in progress. Fourth, defendant faults the trial court for improperly removing him from the courtroom after he started yelling in the presence of the jury. Fifth, defendant argues that, during the trial, he received ineffective assistance of counsel. Sixth, defendant asserts that his prison sentence of 25 to 40 years for assault by strangulation constitutes cruel or unusual punishment. We shall address these six issues in turn.

## A. ADMISSION OF PRELIMINARY EXAMINATION TESTIMONY

Defendant first argues that the trial court abused its discretion by permitting the prosecutor to admit the victim's preliminary examination testimony into evidence at trial. This Court reviews de novo whether the trial court properly interpreted and applied relevant law and properly applied constitutional standards to the facts. *People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019). This Court reviews a trial court's determination that the prosecutor exercised due diligence to secure the presence of a witness for "clear abuse of discretion[.]" *People v Bean*, 457 Mich 677, 684; 580 NW2d 390 (1998). The trial court abuses its discretion "when it selects an outcome that falls outside the range of reasonable and principled outcomes." *Clark*, 330 Mich at 415.

The United States Constitution and the Michigan Constitution of 1963 protect defendant's right to confront the witnesses at trial. See *People v Yost*, 278 Mich App 341, 369-370; 749 NW2d 753 (2008), citing US Const, Am VI; Const 1963, art 1, § 20. This Court analyzes the application of that right under the Michigan Constitution in the same way as under the Sixth Amendment. See *People v Nunley*, 491 Mich 686, 697-698; 821 NW2d 642 (2012). The right to confront witnesses at trial ensures that each witness testifies under oath, can be cross-examined by defense counsel, and can be observed by the jury. *Yost*, 278 Mich App at 370. The right to confront witnesses bars the admission of testimonial statements of a witness who did not appear at trial unless the witness is not available to testify and the defendant had a prior opportunity to cross-examine the witness. *Davis v Washington*, 547 US 813, 821; 126 S Ct 2266; 165 L Ed 2d 224 (2006). A witness may be deemed unavailable to testify at trial if the prosecution has been unable to secure the witness's presence at trial despite having made a good-faith effort to obtain the witness's presence. *Hardy v Cross*, 565 US 65, 69-70; 132 S Ct 490; 181 L Ed 2d 468 (2011).

The constitutional guarantees of the right to confront witnesses are similarly protected by the rules that govern the admission of hearsay. Hearsay is a statement, "other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is inadmissible unless an exception applies. MRE 802. Under one such exception, a witness's prior testimony may be admitted if the witness is unavailable and the party against whom the testimony is offered had an opportunity and a similar motive to develop the testimony. MRE 804(b)(1). A witness is "unavailable" under the rules of evidence when the witness is absent from trial and the prosecution exercised due diligence to procure the witness's attendance. MRE 804(a)(5). If the prosecution can establish that it exercised due diligence within the meaning of MRE 804(a)(5), that showing will satisfy the good-faith effort required under the confrontation clauses as well. See *Bean*, 457 Mich at 682-684.

"The test for whether a witness is 'unavailable' as envisioned by MRE 804(a)(5) is that the prosecution must have made a diligent good-faith effort in its attempt to locate a witness for trial." *Id*. at 684. "The test is one of reasonableness and depends on the facts and circumstances of each case, i.e., whether diligent good-faith efforts were made to procure the testimony, not whether more stringent efforts would have produced it." *Id*. The same is true under the Sixth Amendment:

> The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness' intervening death), "good faith" demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of

good faith may demand their effectuation. The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness. The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. [*Ohio v Roberts*, 448 US 56, 74; 100 S Ct 2531; 65 L Ed 2d 597 (1980) (citations and quotation marks omitted), abrogated in part on other grounds by *Crawford v Washington*, 541 US 36; 124 S Ct 1354; 158 L Ed 2d 177 (2004).]

Here, the trial court received evidence and heard testimony about the prosecution's efforts to obtain the victim's presence at trial on the day after voir dire. The trial court accepted copies of e-mails from Detective Sergeant Ross Eagan (who was unable to testify due to COVID-19) about his efforts to secure the victim's presence for the first trial date, which was adjourned after officers could not locate the victim. In September 2021, Detective Eagan confirmed the victim's address in Kentwood and spoke with a woman who answered the door at the victim's home. The woman stated that the victim was not at home and that she did not know when the victim would return. Detective Eagan provided his contact information to the woman and gave her information about the upcoming court date, but the victim did not contact Detective Eagan after that visit. Detective Eagan returned to that address later, and the same woman answered. The woman was evasive and stated that the victim left town. He also obtained the victim's phone number and left a message on her phone. He stated that he made it clear to the woman living at the victim's home and in his message that the victim had to appear for court. After Detective Eagan was unable to secure the victim's presence, the trial court adjourned the trial date and issued a material-witness warrant for the victim.

Detective Dan Mahoney testified that thereafter he had Kentwood police officers go to the victim's apartment on October 12, 2021. They responded to him that they were unable to contact the victim. Detective Mahoney confirmed the victim's address at the apartment complex and also obtained her work address. Another detective spoke to the victim's employer and found out that the victim had reported to work that morning but had symptoms of COVID-19 and left for a test. Detective Mahoney went to the victim's apartment that night and confirmed from neighbors that the victim lived there. A neighbor also told him that she had just seen the victim on the balcony. Despite all that evidence that the victim was at home, no one answered when Detective Mahoney repeatedly knocked on the door.

Based on the record, the trial court found that the officers made reasonable efforts to secure the victim's presence at the trial. Detective Eagan left messages with a person at the victim's home and with whom it could reasonably be inferred the victim had regular contact, and he left a message on a phone attributed to the victim. The prosecution also obtained one adjournment and requested a material-witness warrant. Detectives verified the victim's home address and her work address, and then they tried to contact her at both locations. Detective Mahoney went to the victim's known address and separately tried to contact the victim in person. He also obtained information that the victim was home at that time, yet she did not answer the door. This was not a situation where the officers first tried to find the witness on the eve of trial after years had passed and then took only rudimentary steps to contact the witness. Cf. *People v James*, 192 Mich App 568, 571-572; 481 NW2d 715 (1992). The officers in this case started trying to secure the victim's presence weeks earlier and identified both her place of employment and her current address. The prosecution also

requested an adjournment and a material-witness warrant to aid in the effort. Officers verified the victim's address and tried to contact her at a time when the evidence showed that she was actually home. Because the officers merely had to take reasonable steps to secure the victim's attendance, the officers were not required to force entry into the victim's apartment and take her to court in handcuffs. See *Roberts*, 448 US at 74. The prosecution only needed to undertake efforts that were reasonable—even if unsuccessful—under the circumstances. See *People v McIntosh*, 389 Mich 82, 87-88; 204 NW2d 135 (1973). Accordingly, the trial court did not err when it concluded that the victim was unavailable. See *Bean*, 457 Mich at 684.

The only remaining issue is whether defendant had an opportunity and a similar motive to develop the victim's testimony at the preliminary examination, as required under MRE 804(b)(1). Whether a party has a similar motive to develop testimony at a particular type of hearing depends on three factors: "(1) whether the party opposing the testimony had at a prior proceeding an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue; (2) the nature of the two proceedings—both what is at stake and the applicable burdens of proof; and (3) whether the party opposing the testimony in fact undertook to cross-examine the witness (both the employed and the available but forgone opportunities)." *People v Farquharson*, 274 Mich App 268, 278; 731 NW2d 797 (2007) (quotation marks omitted).

A preliminary examination usually satisfies these elements because it includes safeguards that approximate those surrounding a conventional trial: the witness must testify under oath before a judicial tribunal, the proceeding is on the record, the defendant is represented by an attorney, and the defense attorney has a meaningful opportunity to cross-examine the witness. See *California v Green*, 399 US 149, 165; 90 S Ct 1930; 26 L Ed 2d 489 (1970); see also *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009) ("Former testimony is admissible at trial under both MRE 804(b)(1) and the Confrontation Clause as long as the witness is unavailable for trial and was subject to cross-examination during the prior testimony."). Additionally, a defendant's lawyer has a similar motive to develop the testimony at a preliminary examination; specifically, he or she has the motive to develop it in a manner that could lead to the dismissal of the charges or be favorable to the defense at trial. See *People v Meredith*, 459 Mich 62, 67; 586 NW2d 538 (1998).

Attorney Michael Adams did not represent defendant at the preliminary examination, but his predecessor, attorney Anna Rapa, did get to cross-examine the victim. In examining her, Rapa was motivated to identify inconsistencies in the victim's testimony and to establish facts favorable to the defense. Moreover, the record shows that she did precisely that. Rapa had the victim testify that she did not believe defendant was trying to harm her during the altercation—he was simply expressing his anger—and she also stated that she did not believe that he was trying to prevent her from breathing. Rapa also had the victim admit that she had been drinking before the altercation and used cocaine the day before. Rapa also developed testimony about whether the victim played a more aggressive role in the altercation. Under the circumstances, defense counsel exercised her opportunity to cross-examine the victim, and she had a similar motive to develop the testimony as a reasonable lawyer would at trial. See *Green*, 399 US at 165; *Farquharson*, 274 Mich App at 278. Thus, the trial court did not abuse its discretion in permitting the prosecution to admit the victim's preliminary examination testimony, see *Bean*, 457 Mich at 684, and the admission of her testimony did not violate defendant's right to confront the witnesses against him. See *Davis*, 547 US at 821.

## B. INEFFECTIVE ASSISTANCE DURING PLEA NEGOTIATIONS

Defendant claims that attorney Adams did not provide him with effective assistance during the plea negotiations. Whether defense counsel provided ineffective assistance involves a mixed question of fact and law. *People v Gioglio (On Remand)*, 296 Mich App 12, 19; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012). This Court reviews de novo whether an act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's case. *Id*. at 19-20. This Court reviews a trial court's findings at an evidentiary hearing for clear error. *Id*. at 20. A finding is clearly erroneous when this Court is left with the definite and firm conviction that the trial court was mistaken. *Id*. at 20-21.

To demonstrate ineffective assistance of counsel that will warrant relief, the defendant must identify an act or omission by counsel that fell below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for the error, the outcome would have been different. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). In the context of plea negotiations, the defendant must show that there was a reasonable probability that, but for counsel's ineffective advice, the defendant would have accepted the plea offer, the prosecutor would not have withdrawn the offer, the trial court would have accepted the plea, and the conviction or sentence would have been less severe than that actually imposed after trial. *Id*.

On appeal, defendant now agrees that the prosecution presented him with a favorable plea offer: the prosecutor offered to allow defendant to plead guilty to domestic violence, third offense, in exchange for dropping the assault-by-strangulation charge, dropping the destruction-of-property charge, and dropping the fourth-offense habitual-offender enhancement. With that deal, defendant might have avoided prison altogether, but he chose to reject the plea offer. Defendant now insists that he would have accepted that offer, but for two misconceptions. He contends that he was under the misconception that he could not, as a matter of law, plead to domestic violence, third offense, because he believed he did not have two prior qualifying convictions. He also mistakenly believed that he could not be convicted of assault by strangulation on the basis of the victim's testimony at the preliminary examination because she opined that defendant was not trying to harm her when he impeded her ability to breathe. He claims his counsel had a duty to correct those misconceptions but failed to do so. Defendant also maintains that attorney Adams did not approach him with the plea offer in a manner that afforded defendant enough time to make an informed decision.

Defendant has not established the factual predicates for his claims of error. The trial court held an evidentiary hearing, and attorney Adams testified about his efforts to advise defendant of the plea offer. Contrary to defendant's assertion, attorney Adams stated that he promptly conveyed the plea offer to defendant, but defendant responded with skepticism about his ability to accept the offer because, in defendant's view, he had not been convicted of two prior incidents of domestic violence. Attorney Adams testified that he researched the issue and later informed defendant that defendant's prior conviction for simple assault under MCL 750.81(1) qualified as an underlying conviction for purposes of domestic violence, third offense, because it involved a domestic partner. See MCL 750.81(5) (providing for an enhanced penalty for a person who commits a violation of MCL 750.81(2) or (3) if that person has two or more prior convictions for assaulting and battering an individual *described* in those two subsections). Attorney Adams informed defendant that when counting the simple assault and the conviction for domestic violence, second offense, defendant could plead guilty to domestic violence, third offense. At the hearing, defendant conceded that he

had been told all that by attorney Adams, but he felt that attorney Adams's efforts were insufficient because Adams did not provide him with proof that Adams's assessment of the law was accurate.

Attorney Adams also testified that he repeatedly told defendant he was facing a minimum sentence of 25 years in prison if he rejected the plea offer. Adams explained that defendant seemed convinced that he would not be convicted at trial. Adams related that he told defendant that, even if the victim did not testify at trial, the prosecutor could use her preliminary examination testimony against defendant. Adams advised defendant that the victim's preliminary examination testimony, considered with the other evidence, would support a conviction. Defendant, in contrast, claimed that Adams told him that he only faced a *maximum* sentence of 25 years in prison. Attorney Adams also stated that he was "sure" he discussed the elements of the assault-by-strangulation charge with defendant in the "year and a half" when they were awaiting trial. Defendant disagreed and stated that Adams never corrected his mistaken belief that the prosecution had to prove that he had the specific intent to harm the victim.

In his supplemental brief on appeal, defendant admits that the trial court made findings of fact that led it to conclude that attorney Adams did not provide ineffective assistance during the plea negotiations. But defendant argues that the trial court clearly erred when it found defendant knew about the plea offer because the trial court relied on the record to reach that conclusion, yet it was mistaken about the record. In making this argument, defendant ignores Adams's testimony and relies on the purported absence of evidence in the circuit-court file. The trial court could rely solely on Adams's testimony to establish that defendant had been properly and timely informed of the plea offer. The trial court resolved those disputes by finding that Adams adequately explained the law and properly advised defendant about the risks and benefits associated with the offer. The trial court further found that Adams clearly advised defendant that he faced a mandatory minimum prison term of 25 years if the jury found him guilty. The trial court was in a much better position to judge the credibility of Adams and defendant. It found that Adams was credible and defendant was not credible, so we will not second-guess that finding. *Gioglio (On Remand)*, 296 Mich App at 26.

The trial court's credibility findings are bolstered by the other record evidence, which tends to corroborate attorney Adams's testimony. An order after a status conference showed that, on the record, defendant rejected a plea offer made in December 2019, when Rapa still represented him. The record showed that defendant also rejected an initial offer to drop the assault-by-strangulation charge and the habitual-offender supplement if he entered a guilty plea to domestic violence, third offense. Rapa represented defendant at that time, but the trial court noted on the record that it had authorized Rapa to withdraw and appointed attorney Adams to represent defendant. Nevertheless, it appears from the record that defendant rejected the plea offer at that time. Similarly, on the first day of trial, Adams informed the trial court that defendant again rejected the offer; he told the court that he had spoken to defendant about the deal "ad nauseam" and even asked the court to question defendant about his understanding of the offer because Adams did not want anybody coming back later and "second guessing" what was presented to defendant. The trial court declined to question defendant because the plea offer had already been "placed on the record at the final pretrial status conference" and defendant had rejected it. For that reason, the trial court did not find it necessary to further develop the record.

Beyond that, contrary to defendant's claim on appeal, the trial court did not misunderstand defendant's position about whether attorney Adams had properly advised him about the applicable law in a manner sufficient to enable defendant to make an informed choice. Attorney Adams was not obligated to present defendant with overwhelming proof that his understanding of the law was correct. Adams only had to conduct sufficient research to make an informed decision and provide defendant with a reasonable explanation of the law and facts as he saw them. Adams testified that he researched the law, reached an informed decision, and advised defendant why it was that he felt that defendant could plead guilty to domestic violence, third offense. See *People v Fonville*, 291 Mich App 363, 392; 804 NW2d 878 (2011) (explaining that, when a statute is succinct, clear, and explicit, counsel has a duty to give correct advice concerning the statute). The trial court believed Adams, and Adams's testimony was sufficient to establish that he acted reasonably in light of the statutory provisions.

Defendant further faults the trial court for not making a specific finding concerning whether attorney Adams advised him about the elements of assault by strangulation and specifically about whether it was a specific-intent crime or a general-intent crime. To be sure, the trial court had to make findings after the hearing, see MCR 2.517(A)(1), but it did not have to offer elaborate detail in making its findings. Brief findings were adequate. See MCR 2.517(A)(2). Although the trial court did not specifically find that Adams discussed the elements with defendant, Adams testified that he was sure that he covered the elements. Adams made clear that he thought defendant could be convicted on the evidence available to the prosecution if the case proceeded to trial, and for that reason, Adams advised defendant to accept the plea offer. Indeed, Adams considered the decision to take the plea offer to be a "no brainer." The trial court stated that it believed Adams and did not believe defendant. It further found that Adams properly advised defendant about the details of the plea offer, which necessarily encompassed advising defendant about the benefits of the plea offer and the risks associated with going to trial. On this record, the trial court's findings were adequate to facilitate appellate review. See *People v Johnson*, 208 Mich App 137, 141-142; 526 NW2d 617 (1994) ("Remand for additional articulation is unnecessary where it is manifest that the court was aware of the factual issues and resolved them and it would not facilitate appellate review to require further explication of the path the court followed in reaching the result."). Simply put, defendant has not demonstrated that the trial court clearly erred when rendering its findings concerning plea negotiations. See *Gioglio (On Remand)*, 296 Mich App at 20-21. Accordingly, defendant has not shown that the trial court clearly erred when it found that Adams furnished advice that was based on a reasonable understanding of the law and adequately explained the benefits and risks associated with accepting or rejecting the plea offer. As a result, defendant has failed to establish that attorney Adams's representation in the plea negotiations fell below an objective standard of reasonableness under prevailing professional norms. See *id*. at 22-23.

## C. VINDICTIVE ADDITION OF A CRIMINAL CHARGE

Defendant next argues that the prosecutor undertook vindictive charging by asking the trial court to amend the information to add a charge of domestic violence, third offense, after defendant exercised his right to proceed to trial. To preserve a claim of error for appellate review, "defendant had to object before the trial court and specify the same ground for objection that he asserts on appeal." *Clark*, 330 Mich App at 414. Attorney Adams did not object to the prosecutor's request to add the charge on the ground that it amounted to prosecutorial vindictiveness. Accordingly, this claim of error is not preserved. See *id*. We review a trial court's decision to allow an amendment

of the information to include a new charge for an abuse of discretion. See *People v Warner*, 339 Mich App 125, 133; 981 NW2d 733 (2021). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. But because this claim of error is unpreserved, we review the claim for plain, outcome-determinative error. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999).

"The prosecution is given broad charging discretion." *People v Nichols*, 262 Mich App 408, 415; 686 NW2d 502 (2004). A prosecutor may pursue any charges that are supported by the evidence, *id*., and may amend the information "before, during, or after trial" with permission from the trial court. MCR 6.112(H). Nevertheless, constitutional limits circumscribe the exercise of a prosecutor's discretion. See *Bordenkircher v Hayes*, 434 US 357, 365; 98 S Ct 663; 54 L Ed 2d 604 (1978). Prosecutors who violate a defendant's due-process rights by punishing the defendant for asserting a protected statutory or constitutional right commit "prosecutorial vindictiveness." *People v Ryan*, 451 Mich 30, 35; 545 NW2d 612 (1996). Prosecutorial vindictiveness may either be actual or presumed. "Actual vindictiveness will be found only where objective evidence of an expressed hostility or threat suggests that the defendant was deliberately penalized for his exercise of a procedural, statutory, or constitutional right." *Id*. at 36 (quotation marks omitted). "The mere threat of additional charges during plea negotiations does not amount to actual vindictiveness where bringing the additional charges is within the prosecutor's charging discretion." *Id*. On the other hand, presumed vindictiveness may arise "only in cases in which a reasonable likelihood of vindictiveness exists." *United States v Goodwin*, 457 US 368, 373; 102 S Ct 2485; 73 L Ed 2d (1982).

Defendant insists on appeal that the prosecutor expressed actual vindictiveness at trial. The prosecutor asked the trial court to amend the information to include a charge of domestic violence, third offense, on the first day of trial before any proofs had been put into evidence. The prosecutor informed the court that he had already given defendant notice of that charge approximately a year earlier: "So I'm going to file this now. Notice was given like a year ago maybe that this was going to happen if we had a trial." The prosecutor's statement about notice having been given referred to plea negotiations. At that time, the prosecutor offered to add a count of domestic violence, third offense, to the existing charges and stated he would drop the other charges and the fourth-offense habitual-offender enhancement if defendant pleaded guilty to the new charge. The prosecutor also sent defendant's attorney a letter warning that he would add the charge of domestic violence, third offense, to the other charges if the case proceeded to trial.

Taken in context, the prosecutor's statement involved plea negotiations. As our Supreme Court has stated, the "mere threat of additional charges during plea negotiations does not amount to actual vindictiveness where bringing the additional charges is within the prosecutor's charging discretion." *Ryan*, 451 Mich at 36. The prosecutor's decision to file one additional charge after defendant rejected the plea offer does not give rise to a presumption of vindictiveness. See *People v Jones*, 252 Mich App 1, 8; 650 NW2d 717 (2002). Defendant has not cited any other evidence that the prosecutor brought the charge out of vindictiveness. Defendant also has not identified any other basis for concluding that the trial court erred in allowing the amendment of the information to include that charge. Thus, he has not established plain error that warrants relief. See *Carines*, 460 Mich at 763.

## D. REMOVAL OF DEFENDANT FROM THE COURTROOM

We next must consider defendant's argument that the trial court deprived him of a fair trial by removing him from the courtroom after an outburst without giving him warning that he could be removed. Attorney Adams did not object to the removal of defendant, as defendant concedes on appeal, so this claim of error was not preserved. See *Clark*, 330 Mich App at 414. This Court reviews de novo whether the trial court properly applied constitutional law. *Id.* Because this claim of error was not preserved for appellate review, however, this Court's review is limited to a search for plain, outcome-determinative error. See *Carines*, 460 Mich at 763.

Defendant had a constitutional right to be present at every critical stage of the proceedings against him. See *People v Staffney*, 187 Mich App 660, 663; 468 NW2d 238 (1991). But the right to be present is not absolute. *Id.* Defendant could lose his right to be present if, after having been warned that he would be removed for being disruptive, he continued to exhibit disruptive behavior. See *id.* at 664. A trial court also has the authority to remove a defendant without warning if his or her disruptive behavior amounted to violence against another person. *Id.* at 665. Here, defendant argues that the trial court erred when removing him because it failed to warn him before resorting to removal. The record completely undercuts that argument.

The disruption began with an unidentified woman yelling from the gallery. Defendant also yelled: "Julia is right there, your Honor. She's right there. I should not do this. She's right there." The trial court immediately warned defendant that he needed to be quiet or he would be removed: "Hold on a second. You listen. You be quiet, or I'll have you removed and put in jail. All right?" Defendant ignored the warning and criticized the judge: "You're not allowing me to defend myself at all." As the judge ordered the bailiff to take the jury out of the courtroom, defendant continued his rant, stating: "This is wrong, man. I did not do this, man. What is going on? Why is this being done to me? I don't get this, man. She jumped on me." An unidentified woman then yelled from the gallery again, and the trial court ordered her out of the courtroom. The trial court then listened to the prosecutor's request to have defendant removed and granted it. When the jurors returned, the trial court gave them their final instructions. In those instructions, the trial court explained that defendant's outburst was not evidence and it had no bearing on his guilt or innocence. The court told the jurors to disregard the outburst.

As the record indicates, the trial court ordered defendant to "be quiet" and warned him that he could be removed for disruptive behavior if he did not comply. The trial court had defendant removed only after he continued his outburst, which occurred—at least in part—while the jury was leaving the courtroom. Defendant has not established that the trial court plainly erred by removing him from the courtroom without giving him the opportunity to conduct himself with the necessary decorum. In addition, even if it were plain error to remove defendant, not every absence from the courtroom mandates a new trial. Instead, the test is whether there was any reasonable probability that defendant was prejudiced by his absence. See *People v Buie*, 298 Mich App 50, 59-60; 825 NW2d 361 (2012). Defendant has not cited any prejudice that might have flowed from his absence during the final jury instructions. Instead, he merely asserts that this Court must treat the error as a structural error and automatically reverse. Defendant relies upon authority citing the closure of the courtroom to the public as a structural error. See *People v Davis*, 509 Mich 52, 66-67, 72-74; 983 NW2d 325 (2022). Michigan courts have not extended structural error to include a defendant's absence from the courtroom. See *Buie*, 298 Mich App at 59-60; see also *United States v Riddle*,

249 F3d 529 (CA 6, 2001) (declining to expand structural error to include a defendant's absence during voir dire). On this record, we find no basis to conclude that defendant's absence from the courtroom during the final instructions prejudiced defendant. Therefore, even if it were error to remove him, that error would not warrant relief on appeal. See *Buie*, 298 Mich App at 59-60. And beyond that, defendant surely has not demonstrated plain error that affected his substantial rights. See *Carines*, 460 Mich at 763.

## VI. INEFFECTIVE ASSISTANCE AT TRIAL

Defendant presents a collection of claims that he received ineffective assistance of counsel at trial. To prevail on his claims of ineffective assistance of counsel, defendant must establish that defense counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland v Washington*, 466 US 668, 688, 694; 104 S Ct 2052; 80 L Ed 674 (1984); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Effective assistance of counsel is presumed, and the defendant bears a heavy burden to prove otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). The defendant "has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). The defendant "must overcome the strong presumption that counsel's actions constituted sound trial strategy under the circumstances." *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant first asserts that attorney Adams did not provide meaningful adversarial testing during the trial, so prejudice should be presumed under the decision in *United States v Cronic*, 466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984). As our Supreme Court has explained, according to *Cronic*, "prejudice is presumed" when " 'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[.]' " *People v Frazier*, 478 Mich 231, 243 n 10; 733 NW2d 713 (2007). Significantly, "[t]he *Cronic* test applies when the attorney's failure is *complete*, while the *Strickland* test applies when counsel failed at specific points of the proceeding." *Id*. at 244. Thus, we must consider whether attorney Adams completely failed to represent defendant at the trial, or instead whether he arguably failed defendant at "specific points" during the trial. *Id*. at 244-245.

In presenting his claim of ineffective assistance of counsel, defendant summarizes attorney Adams's handling of the defense and complains about discrete acts or omissions that purportedly establish that Adams did not subject the prosecution's case to meaningful adversarial testing. By identifying discrete acts and omissions and evaluating their reasonableness, defendant concedes, in effect, that *Cronic* does not apply. See *id*. Moreover, it is evident from the record that attorney Adams made an effort to test the prosecutor's case. Adams opposed the admission of the victim's preliminary examination testimony, made an opening statement and a closing argument, and cross-examined each witness. Given defendant's choice not to testify and the victim's absence from the trial, there was not much Adams could do beyond cross-examining the witnesses and offering an alternate view of the evidence. Thus, on this record, the trial court did not err when it refused to apply the *Cronic* test and reviewed the claims of ineffective assistance under the test articulated in *Strickland*. See *id*.

Turning to defendant's discrete claims of ineffective assistance of counsel, he asserts that attorney Adams provided ineffective assistance throughout his trial. Defendant first contends that Adams's conduct fell below an objective standard of reasonableness when he informed the jury in his opening statement that he intended to present evidence that the victim was the aggressor on the night at issue, but then failed to present any evidence that she was, in fact, the aggressor. The trial court found that Adams made that statement on the assumption that defendant would testify about his version of events, and that defendant's subsequent decision not to testify resulted in the broken promise to present such evidence. The purpose of an opening statement is to inform the jury about the facts that defense counsel believes will be established at trial. See *Ericksen*, 288 Mich App at 200. It is not improper for defense counsel to mention proposed testimony or evidence if defense counsel reasonably believes the evidence will be presented to the jury. See *People v Hill*, 257 Mich App 126, 139-140; 667 NW2d 78 (2003).

The trial court found that defendant caused attorney Adams to believe that he would testify. For that reason, the trial court found that it was reasonable for Adams to inform the jury that there would be evidence that the victim was the aggressor. Defendant complains on appeal that the trial court's finding was mistaken because defendant denied that he told attorney Adams that he would testify and Adams's testimony established only that defendant was considering whether to testify. But the trial court found Adams to be credible and found that defendant lacked credibility. Adams testified that defendant stated "he was going to testify at one time." Although Adams's testimony was not unequivocal, it nevertheless supported the trial court's finding. On this record, the trial court did not clearly err when it found that Adams believed that defendant would testify. *Gioglio (On Remand)*, 296 Mich App at 20-21. Although it might have been prudent for Adams to confirm that defendant would testify before giving his opening statement, it was nonetheless reasonable for Adams to inform the jury about the evidence that he intended to present if defendant did not change his mind about testifying. See *Hill*, 257 Mich App at 139-140. Consequently, defendant has failed to establish that it fell below an objective standard of reasonableness under prevailing professional norms for Adams to tell the jury in his opening statement that he would furnish evidence that the victim was the aggressor. See *Gioglio (On Remand)*, 296 Mich App at 22.

Defendant next claims that Adams's failure to object to Officer Donker's testimony about the victim's statements to him fell below an objective standard of reasonableness under prevailing professional norms. As the prosecution correctly notes, however, the victim's statement to Officer Donker met all the requirements for admission under MCL 768.27c(1), even though the statement might be inadmissible hearsay under MRE 801 and MRE 802. Specifically, the victim's statement narrated, described, or explained the infliction of physical injury, MCL 768.27c(1)(a); involved domestic violence, MCL 768.27c(1)(b); was provided at the hospital within hours of the assault, MCL 768.27c(1)(c); had indicia of trustworthiness, MCL 768.27c(1)(d) and MCL 768.27c(2); and was made to a law-enforcement officer, MCL 768.27c(1)(e). See *People v Meissner*, 294 Mich App 438, 446-451; 812 NW2d 37 (2011). Because Officer Donker could testify about the victim's statement to him under MCL 768.27c(1), as Adams correctly observed at the evidentiary hearing, any objection would have been fruitless. Adams had no obligation to make a meritless objection. See *Clark*, 330 Mich App at 426.

Defendant next insists that attorney Adams opened the door to prejudicial testimony when cross-examining Officer Donker, which amounted to ineffective assistance. At trial, Adams was able to get Officer Donker to admit that he did not know how the victim sustained injuries. Officer

Donker further conceded that he did not know what the victim did between the time of the incident with defendant and the time that she went to the hospital. Officer Donker also acknowledged that he did not ask the victim whether she had been involved in an altercation with anyone else. Adams further used Officer Donker's report to suggest that Officer Donker's testimony about the victim's statement was inaccurate. Additionally, Officer Donker admitted that, according to his report, the victim told him that the argument began in the bedroom, not the living room. Adams then asked Officer Donker whether the victim told him why she did not report the incident immediately, and Officer Donker said the victim indicated she could not safely report the incident. Officer Donker stated that the victim implied she was scared. Officer Donker then denied that the victim told him where she was that night or told him that she went to someone else's house.

Attorney Adams testified at the evidentiary hearing that he pursued the line of questioning about the delay in reporting because defendant wanted him to do so and he hoped to get an answer that might have suggested that something else could have happened to the victim while she was not with defendant. Adams's cross-examination of Officer Donker showed that Adams was trying to undermine the victim's credibility through Officer Donker, which was the only avenue available to the defense because the victim did not testify in person. Attorney Adams tried to elicit testimony that the victim might have gone somewhere else after she left the apartment. That line of questions also might have elicited testimony that would assist Adams in arguing that another incident might have explained the injuries to the victim's face that appeared in the photographs from the hospital. Moreover, as Adams stated at the evidentiary hearing, defendant apparently wanted him to pursue that line of questioning.

Although the cross-examination had only marginal value in undermining the credibility of the victim and posed a risk of eliciting damaging testimony, attorney Adams had to weigh the risks against the fact that he had no other method to undermine the victim's credibility. Adams also had to contend with a client who had strong views about how to proceed and who believed that the line of questioning was important to his case. Under the circumstances, the trial court did not err when it found that defendant did not overcome the presumption that Adams's choice to pursue that line of questioning amounted to reasonable trial strategy. See *Gioglio (On Remand)*, 296 Mich App at 22. Although Adams's strategy did not work, that does not mean it was unreasonable to pursue that strategy. See *People v Stewart (On Remand)*, 219 Mich App 38, 42; 555 NW2d 715 (1996).

Defendant next challenges attorney Adams's failure to contest Dr. Tanis's testimony as an expert. Specifically, defendant notes that Dr. Tanis was never formally recognized as an expert by the trial court, so defendant suggests that Dr. Tanis was just a "run-of-the mill emergency room physician" who had never before testified as an expert and who was not a "forensic pathologist." The trial court noted that the prosecutor laid the foundation for Dr. Tanis's testimony as an expert at trial. It further concluded that Dr. Tanis was, in fact, qualified to testify as an expert under MRE 702. Thus, the trial court reasoned that the failure to take the formal steps to verify that Dr. Tanis was qualified and allowed to testify as an expert did not harm defendant. Indeed, had it been done, it might have bolstered Dr. Tanis's credibility. Defendant did not develop the record on Dr. Tanis's qualifications, and he has not offered any plausible basis for excluding a trained emergency room physician with years of experience working in the emergency room from testifying as an expert in emergency medicine. Given Dr. Tanis's credentials, attorney Adams could reasonably accept Dr. Tanis as an expert without formal proof of his qualifications as an expert. Adams had no obligation to pursue a meritless challenge to the doctor's credentials. See *Clark*, 330 Mich App at 426.

-13-

Defendant further argues that attorney Adams provided ineffective assistance by failing to object to Dr. Tanis's testimony that the victim reported that she was involved in an argument with her boyfriend who saw a message on her phone and with whom there was a "history of violence." He maintains that Dr. Tanis's testimony amounted to inadmissible character evidence. The trial court concluded that Dr. Tanis's statement about the history reported by the victim was admissible pursuant to the hearsay exception for statements made for the purpose of medical treatment under MRE 803(4). The trial court further explained that the statement was harmless. In response to the trial court's opinion, defendant argues that the trial court erred because the victim's statement was not reasonably necessary for medical treatment and, in any event, such propensity evidence was not admissible even if the hearsay exception applied.

Evidence that defendant had committed other acts of domestic violence against the victim could have been admitted for any purpose for which it was relevant—even to establish defendant's propensity to engage in domestic violence. See MCL 768.27b(1); *Meissner*, 294 Mich App at 451-452. In addition, as the trial court correctly noted, the hearsay exception in MRE 803(4) can apply to a patient's complete medical history in cases involving assaults that might include psychological injuries in addition to physical injuries. See *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011). For all these reasons, attorney Adams could reasonably conclude that objecting to the statement on propensity or hearsay grounds would have been futile and likely would have further highlighted the prejudicial testimony. Accordingly, defendant has not overcome the presumption that Adams acted reasonably when he did not object to Dr. Tanis's brief statement that the victim had reported a history of domestic violence. See *Gioglio (On Remand)*, 296 Mich App at 22.

Moreover, Dr. Tanis's statement was indirect and did not involve any details. By contrast, the victim's preliminary examination testimony established in detail that defendant attacked her, forced her down, and covered her mouth and nose, thereby making it hard for her to breathe. In addition, the victim's preliminary examination testimony revealed that defendant then pursued her after she broke free from him and fled. The jury also heard that he pulled over his car, got out, ran up to the victim, and struck her so hard in the back of the head that she was knocked to the ground. The victim's testimony was consistent with Dr. Tanis's diagnoses, Officer Donker's observations, and photographic evidence. Given that overwhelming evidence, any prejudice occasioned by Dr. Tanis's brief statement about the history of domestic violence was harmless and, indeed, harmless beyond a reasonable doubt. Accordingly, even if attorney Adams's failure to object fell below an objective standard of reasonableness under prevailing professional norms, it did not warrant relief. See *Gioglio (On Remand)*, 296 Mich App at 23.

Defendant asserted in the trial court that attorney Adams's cross-examination of Dr. Tanis was deficient. Specifically, defendant faulted Adams for eliciting testimony on cross-examination that established that the victim's injuries were quite likely caused by strangulation or suffocation. At trial, Dr. Tanis testified about petechiae—small burst blood vessels—that he observed in the victim's eyes and mouth. He explained that there were several possible causes for petechiae, which included strangulation or forceful vomiting. On cross-examination, Adams had Dr. Tanis concede that he could not state with certainty what caused the petechiae. Adams then asked Dr. Tanis about vertigo, so Dr. Tanis explained what it was and he agreed that vertigo could cause nausea, which might lead to vomiting. After pursuing that line of questions involving vertigo, Adams then asked whether it was true that Dr. Tanis had earlier noted that vomiting could cause petechiae. Dr. Tanis

agreed that vomiting causes petechiae around the nose and in the eyes, but he clarified that he had not seen petechiae on the lips that had been caused by vomiting.

Attorney Adams clearly was trying to develop Dr. Tanis's testimony in a way that would permit him to argue that the victim's injuries might have been caused by vomiting, rather than by strangulation or suffocation, but he received an answer that foreclosed that possibility. The trial court determined that a reasonable lawyer in Adams's position would not have pursued that line of questioning without first researching whether petechiae on the lips could be caused by vomiting. The trial court nonetheless concluded that defendant had failed to show that there was a reasonable probability that, but for that line of questioning, the outcome of the trial would have been different. As the trial court aptly stated, defendant had not identified any basis to rebut Dr. Tanis's testimony, which might have been revealed by further investigation. Moreover, Dr. Tanis had already offered testimony that established the connection between the victim's observed injuries and the evidence that she had been suffocated earlier. As a result, Adams's choice to pursue that line of questioning without first investigating did not cause sufficient prejudice to conclude that there was a reasonable probability that, but for the failure to investigate, the outcome would have been different. See *id.*

Finally, defendant claims attorney Adams provided ineffective assistance when he failed to object to the trial court's decision to remove defendant from the courtroom without first warning him. But, as we have explained, the trial court did warn defendant before removing him. For that reason, an objection on that basis would have been futile, and Adams had no obligation to make a futile objection. See *Clark*, 330 Mich App at 426. In addition, given the severity of defendant's outburst in front of the jury and the fact that the only portion of the trial remaining was instruction of the jury before their deliberations, Adams could reasonably conclude that defendant's removal for the jury instructions would be best for defendant. Therefore, defendant has failed to overcome the presumption that Adams's decision not to contest defendant's removal fell within the range of reasonable representation. See *Gioglio (On Remand)*, 296 Mich App at 22. In sum, the trial court did not err in rejecting defendant's claims of ineffective assistance of counsel.

## F. CRUEL OR UNUSUAL PUNISHMENT

Finally, defendant argues that his minimum sentence of 25 years in prison amounts to cruel or unusual punishment under Michigan law. To preserve that argument, though, defendant had to assert it during the sentencing process. *People v Burkett*, 337 Mich App 631, 635; 976 NW2d 864 (2021). Defendant did not do so at his sentencing hearing or in a motion for resentencing, so this claim of error was not preserved. See *id.* This Court typically reviews de novo whether a sentence amounted to cruel or unusual punishment. See *People v Benton*, 294 Mich App 191, 203; 817 NW2d 599 (2011). But because this claim of error was not preserved, this Court reviews the claim only for plain error that affected defendant's substantial rights. *Burkett*, 337 Mich App at 635. An error affects substantial rights if it affected the outcome of the lower-court proceedings. *Id.*

The Legislature has decreed that if a defendant has been convicted of three or more felonies or attempts to commit felonies, and the defendant commits another felony, he or she is subject to enhanced penalties. MCL 769.12(1). If the offense of conviction is a "serious crime" and one or more of the "prior felony convictions are listed prior felonies," the trial court must impose a prison term of at least 25 years. MCL 769.12(1)(a). Defendant was convicted of unarmed robbery, which is a listed prior felony. See MCL 769.12(6)(a)(*iii*); MCL 750.530. Additionally, the term "serious

crime" is defined to include assault by strangulation. See MCL 769.12(6)(c); MCL 750.84. Thus, the trial court had no discretion to sentence defendant to serve less than 25 years' imprisonment. See MCL 769.12(1)(a). Defendant complains that the provisions of MCL 769.12(1)(a) constitute cruel or unusual punishments.

Michigan's constitution prohibits cruel or unusual punishment. See Const 1963, art 1, § 16. In contrast, the United States Constitution prohibits only cruel *and* unusual punishments. See US Const, Am VIII. Because the Michigan Constitution provides broader protection, if a punishment passes muster under the Michigan Constitution, it necessarily satisfies the requirements of the United States Constitution. *Benton*, 294 Mich App at 204. Defendant frames this claim of error in terms that implicate both a facial challenge to MCL 769.12(1)(a) and a challenge to application of that statute in his case. To establish that the statute is facially unconstitutional, defendant must show that there is no set of circumstances under which the statute could be constitutionally applied. See *Burkett*, 337 Mich App at 637-638. But this Court has already decided that MCL 769.12(1)(a) is not unconstitutional on its face. See *id*. at 638-642. Consequently, we are bound to conclude that MCL 769.12(1)(a) is not facially unconstitutional, so defendant's only viable option is to establish that the statute, as applied to him, amounts to an unconstitutionally cruel or unusual punishment.

In considering whether the mandatory minimum penalty of 25 years in prison rises to the level of cruel or unusual punishment as applied to defendant here, we begin by observing that this Court has "held that habitual-offender statutes 'are constitutional and the sentences under them are not cruel and unusual, because the state has a right to protect itself from individuals who continue to engage in criminal activity.' " *Burkett*, 337 Mich App at 637. And beyond that bright-line rule, we have commented that "[l]egislatively mandated sentences are presumptively proportional and presumptively valid.' " *Id*. Because defendant's 25-year minimum sentence was mandated by the Legislature in MCL 769.12, it is presumptively proportionate, so "defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate." *Id*. He cannot do that in this case.

Defendant characterizes his mandatory sentence as disproportionate because he committed his listed prior felony—unarmed robbery—32 years earlier and, but for that offense, he would not qualify for the mandatory minimum sentence prescribed by MCL 769.12(1)(a). It is true that, but for that offense committed in 1989, defendant would not be subject to a mandatory minimum term of 25 years. But it is also true that he would not be subject to the mandatory minimum prison term if he had not assaulted the victim by strangulation or had not committed several other felonies over the years. Defendant's claim suggests that he complied with the law for the 32-year period since his last serious crime. But his criminal record demonstrates that he has not been able to reform his behavior. Defendant was placed on probation for his listed prior felony, but he was subsequently sentenced to a prison term for violating probation. And after his completion of that prison term, defendant committed a serious drug offense that resulted in a prison sentence of 5 to 20 years. He was released on parole in 2008, but returned to prison for violating the terms of his parole. After he was released again from prison, defendant served jail terms for indecent exposure, domestic violence, and malicious destruction of property. Over his lifetime, defendant has amassed so many convictions that his prior record variable score was set at 117 points, 42 points higher than the 75-point cutoff for the highest prior record variable level of F. Thus, defendant's record demonstrates that he is exactly the type of person that the Legislature targeted with the habitual-offender statute.

Accordingly, defendant cannot demonstrate that the trial court committed plain error by failing to conclude, sua sponte, that MCL 769.12(1)(a) is unconstitutional as applied to him.[1]

Affirmed.

/s/ Christopher P. Yates
/s/ Stephen L. Borrello
/s/ Sima G. Patel

---

[1] Our Supreme Court recently ruled that a minimum prison term within the applicable sentencing guidelines range must be reviewed for reasonableness. *People v Posey*, ___ Mich ___, ___; ___ NW2d ___ (2023); slip op at 4-5. Although defendant here received a mandatory minimum prison term and failed to preserve a challenge to that sentence because he never objected to it in the trial court, we have provided a detailed analysis of proportionality that also explains why defendant's sentence is reasonable.